163 N.J. Super. 501 (1978)
395 A.2d 241
ALVA REAHL, JOAN ROHN, EDWARD P. GLECKLER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS,
v.
RANDOLPH TOWNSHIP MUNICIPAL UTILITIES AUTHORITY, AND ITS MEMBERS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1978.
Decided November 20, 1978.
*504 Before Judges CONFORD, PRESSLER and KING.
Ms. Jo Anne Ivory Gibson, Assistant Deputy Public Advocate, argued the cause for appellants (Mr. Stanley C. Van Ness, Public Advocate of New Jersey, attorney).
Mr. Edward J. Buzak argued the cause for respondents (Messrs. Villoressi and Buzak, attorneys).
The opinion of the court was delivered by KING, J.A.D.
This is an action in lieu of prerogative writs brought by certain residents of single-family dwelling units in Randolph Township against the Randolph Township Municipal Utilities Authority (Randolph MUA). The action seeks relief from payment of an annual $125 service charge imposed on the owners of these single-family dwellings by the Randolph MUA. Specifically, the complaint demands relief (1) permitting the matter to proceed as a class action, (2) declaring the illegality of a portion of the service charge and (3) restraining the collection of $75 of the total $125 service charge. The trial judge certified the class and thereafter, on cross-motions for summary judgment, granted judgment for defendant Randolph MUA. On appeal plaintiffs *505 contend that the judge erred in dismissing the action as time-barred by R. 4:69-6 and in holding on the merits that defendant had a right to impose the $125 service charges upon them.
In October 1972 the Randolph MUA began operation of the water and sewer systems in Randolph Township. About 145 single-family dwelling units in Randolph Township had always been connected directly to the adjacent Town of Dover's sewer system. The residents of these units comprise the plaintiff class. These plaintiffs' sewer lines had never been connected to any sewer lines owned or operated by defendant Randolph MUA. In the 1950s these plaintiffs or their predecessors had opted to connect to Dover's sewer system rather than use individual septic systems. Individual connection fees of $350 were paid to Dover at that time. The sewerage of the class plaintiffs had been transmitted through the Dover system to the treatment plant operated now by the Rockaway Valley Regional Sewerage Authority (Rockaway Authority), which also served nine other municipalities and authorities in the region.
Plaintiffs had been charged, in years past, a $5 annual service charge by Dover. This charge was raised by Dover to $10 in 1973. This was plaintiffs' total outlay for the transmission of their sewerage through the Dover system and for its ultimate treatment and disposition. The $10 fee was devoted entirely to pipe maintenance by Dover. In the 1950s and 1960s the Dover sewerage had been treated without charge by the City of Jersey City Treatment Plant in the Township of Parsippany-Troy Hills, the predecessor to the Rockaway Authority. The Rockaway Authority was formed in the early 1970s as the successor to Jersey City's facility.
Sometime early in 1976 defendant Randolph MUA discovered that it had been billed for several years by the Rockaway Authority for the treatment of all sewerage originating in Randolph Township, including the sewerage which came from plaintiffs' residences, but which was transmitted exclusively through the Dover system. Also, early in 1976 *506 Dover decided to bill Randolph Township annually for the use its residents made of the Dover system, rather than continue the customary individual billing to each connectee. By letter of February 17 defendant Randolph MUA agreed to pay Dover $10 annually for each connection of a Randolph Township residence to the Dover sewer system.
On March 1, 1976 defendant Randolph MUA notified the residents of Randolph Township comprising the plaintiff class and connected to the Dover system that henceforth they would be customers of the Randolph MUA and would be charged the standard annual fee for single-family residences, $125. The written notice to the Dover connectees included the following:
It had been our understanding that the Town of Dover assumed all responsibility for your sewerage. However, based on recent disclosures by the Rockaway Valley Regional Sewerage Authority, we learned that the Randolph Township Municipal Utilities Authority bears the financial responsibility for your sewerage, and has been incurring the costs for the past several years.
As a result, commencing April 1, 1976, you will become a sewer customer of the Randolph Township Municipal Utilities Authority. By State Law, all of our customers must be billed at the same rate.
The class plaintiffs thereafter became the "customers" of the Randolph MUA, even though their sewerage did not pass through any lines maintained by the Randolph MUA. However, plaintiffs received the same collection and treatment services at the same fee as all other residents of single-family dwelling units in Randolph Township.
The Rockaway Authority provides, pursuant to service contracts, treatment facilities for sewerage originating in the Townships of Randolph, Boonton, Denville and Rockaway; the Towns of Boonton and Dover; the Boroughs of Rockaway, Wharton and Victory Gardens, and the City of Jersey City. The cost of treatment is apportioned and billed to each member municipality or its municipal utilities authority. Randolph Township's total billing from the Rockaway Authority in 1976 was about $52,000. This cost *507 was allocated on the basis of the municipality of origin of the effluent, rather than the originating collecting system. Thus, the charge for the class plaintiffs' sewer gallonage was billed to Randolph Township rather than Dover.
A full understanding of the intricate interdependence of the sewerage disposal scheme serving Randolph Township residents requires a detailed exposition of the four collection routes in the system.[1]

1. Randolph Township to the Rockaway Authority through Denville.

This agreement between Randolph Township and Denville is based on a charge of $.25 per thousand gallons as a transmission/maintenance fee for the use of the Denville sewer lines utilized by this group of Randolph Township residents. In addition, the Randolph MUA pays Denville $17,000 a year for its share of the cost of the Denbrook interceptor line through which the effluent flows. This sum is payable each year for 20 years  a total of $340,000  as Randolph Township's capital contribution to the Denville system. Denville and Randolph Township each own the lines located in their respective municipalities. The Randolph MUA pays the annual treatment charge directly to the Rockaway Authority.

2. Randolph Township to the Rockaway Authority through Victory Gardens.

Randolph Township pays the Borough of Victory Gardens a transmission/maintenance fee of $.27 per thousand gallons, an estimated annual charge of $29.56 per unit, for the flow of its residents' sewerage through lines owned by Victory *508 Gardens, which owns all connecting sewer lines, both within Victory Gardens and within Randolph Township. The cost of treatment is paid directly to the Rockaway Authority by the Randolph MUA.

3. Randolph Township to the Rockaway Authority through Dover.

The class plaintiffs in this case are within this category. The Randolph MUA now pays Dover $10 per single-family residential unit as a transmission/maintenance fee. As in the case of Victory Gardens, Dover owns all of the sewer lines, both in Dover and in Randolph Township. Again, the treatment fee for this effluent is included in the Rockaway Authority's annual charge to the Randolph MUA.

4. Randolph Township to the Morris Township Treatment Plant through Morris Township.

This sewerage flow is the exception, and does not go to the Rockaway Authority treatment plant, but instead goes to the Morris County Treatment Plant. In this case the Randolph MUA and Morris Township each own the lines located within their respective municipal entities. The Randolph MUA pays Morris Township $128 a year for each single-family dwelling unit located in Randolph Township flowing sewerage into the Morris Township system. This annual charge includes transmission/maintenance fees, as well as treatment fees.
All single-family dwelling units in Randolph Township, regardless of the routing of the sewerage, are therefore billed a uniform annual sewerage rate of $125 by Randolph MUA. Because of the diverse collection and treatment systems used in Randolph Township, as described above, the actual per unit cost to the Randolph MUA for each of the four groups of residential units is, of course, different.
Randolph MUA contends that since all single-family residential units within its borders are charged the same rate, *509 it complies with the legal requirement of uniform rates among the same class of user. N.J.S.A. 40:14B-22. It urges that any attempt to vary the annual charge, depending on which of the four paths the particular user's effluent takes enroute to treatment, is both impractical administratively and illegally nonuniform. It asserts that there is no legal requirement that it vary the charges within a particular class of users, simply because accidents of internal geography within its borders create four separate cost-categories for transmission and treatment. The Public Advocate, appearing for the class plaintiffs, takes a contrary position, contending that since the Randolph MUA provides no actual transmission or treatment services to the class plaintiffs, they are not part of the Randolph MUA's system as contemplated by N.J.S.A. 40:14B-22, cannot be considered the Randolph MUA's customers, and cannot be charged service fees. The Public Advocate, of course, concedes that the class plaintiffs are legally responsible for the Rockaway Authority's annual treatment charge per unit, arguably about $45, and Dover's $10 annual charge per unit, but resists any additional charges to the plaintiffs.

I
We first consider the propriety of the trial judge's ruling that plaintiffs' suit was not commenced within 45 days of the date of "accrual of the right to the review, hearing or relief claimed," as required by R. 4:69-6(a). Plaintiffs were notified in March 1976 that beginning April 1, 1976 they would be billed by defendant as its sewer customers. This complaint was not filed until December 21, 1976.
Our rules permit relaxation of the 45-day requirement "where it is manifest that the interest of justice so requires." R. 4:69-6(c). One of the recognized reasons for relaxing the 45-day rule is the consideration of an important public, rather than private interest, requiring adjudication. Brunetti v. New Milford, 68 N.J. 576, 586 (1975). Although *510 the costs of sewer service to each of the class plaintiffs is a personal expense, the question of the power of the Randolph MUA to charge these class plaintiffs the standard annual rate for single family dwellings is an issue of public importance requiring adjudication. Additionally, in view of the dealings between the parties, there is some doubt in this record when the dispute between the class plaintiffs and the Randolph MUA actually crystallized along firm lines sufficient to call forth the policy of repose, despite the April 1, 1976 billing date. Schack v. Trimble, 28 N.J. 40, 49-51 (1958). For these reasons and because of the continuing impact of the question upon the parties we conclude that the interests of justice require an enlargement of time under R. 4:69-6(c).

II
The Randolph MUA was formed in 1971 pursuant to the then Municipal Utilities Authorities Law. N.J.S.A. 40:14B-1 et seq. The policy of this act was broadly stated by the Legislature in the following declaration of purpose:
It is hereby declared to be in the public interest and to be the policy of the State to foster and promote by all reasonable means the provision and distribution of an adequate supply of water for the public and private uses of counties and municipalities and their inhabitants, and the relief of waters in or bordering the State from pollution, and thus the reduction and ultimate abatement of the menace to the public health resulting from such pollution. It is the purpose and object of this act to further and implement such policy by
(1) Authorizing counties, or municipalities either separately or in combination with other municipalities, by means and through the agency of a municipal authority, to acquire, construct, maintain, operate or improve works for the accumulation, supply or distribution of water, and works for the collection, treatment, purification or disposal of sewerage or other wastes;
*511 (2) Authorizing service charges to occupants or owners of property for direct or indirect connection with and the use, products or services of such works, and providing for the establishment, collection and enforcement of such charges;
(3) Creating as bodies corporate and politic municipal authorities to have full responsibility and powers with respect to such works and the establishment, collection, enforcement, use and disposition of all such service charges;
(4) Providing for the financing of such works, for the issuance of bonds therefor, and for the payment and security of such bonds; and
(5) In general, granting to counties and municipalities and to such municipal authorities discretionary powers to provide for utility services designed to provide or distribute such a supply of water, or to relieve pollution of such waters in or bordering the State at the expense of the users of such services or of counties or municipalities or other persons contracting for or with respect to the same. N.J.S.A. 40:14B-2. [Emphasis supplied]
As to the nature of authorities formed under this act our Supreme Court has stated:
Such an authority is the alter ego of the municipality with broad delegated powers to supply these essential public needs. Jordan v. Zidel, 40 N.J. 244, 247-248 (1963); Retsky v. Municipal Utilities Authority, 91 N.J. Super. 74, 79 (Law Div. 1966). In effect, the enabling statute confers a legislative franchise upon a municipal authority to furnish water and sewer service, exclusive except with its consent, to the municipal area specified in the creating ordinance. [In re Petition of South Lakewood Water Co., 61 N.J. 230, 249 (1972)]
The broad legislative purpose was further emphasized by N.J.S.A. 40:14B-68, which states in pertinent part:
This act shall be construed liberally to effectuate the legislative intent and as complete and independent authority for the performance of each and every act and thing herein authorized, * * *.
See also, Darrah v. Evesham Tp., 111 N.J. Super. 62, 64-65 (App. Div. 1970).
The purpose of an authority formed pursuant to the act to perform sewer disposal services is further detailed in N.J.S.A. 40:14B-19, which states in relevant part:
*512 (a) The purposes of every municipal authority shall be * * * (2) the relief of waters in or bordering the State from pollution arising from causes within the district and the relief of waters in, bordering or entering the district from pollution or threatened pollution, and the consequent improvement of conditions affecting the public health, (3) the provision of sewage collection and disposal service within or without the district, * * *
(b) Every municipal authority is hereby authorized, subject to the limitations of this act, to acquire, in its own name but for the local unit or units, by purchase, gift, condemnation or otherwise, lease as lessee, and, notwithstanding the provisions of any charter, ordinance or resolution of any county or municipality to the contrary, to construct, maintain, operate and use * * * treatment, purification and filtration plants or works * * * at such places within or without the district * * * as in the judgment of the municipal authority will provide an effective and satisfactory method for promoting purposes of the municipal authority.
(c) Every municipal authority is hereby authorized and directed, when in its judgment its sewerage system or any part thereof will permit, to collect from any and all public systems within the district all sewage and treat and dispose of the same in such manner as to promote purposes of the municipal authority.
Specific authority to contract for sewerage treatment is found in N.J.S.A. 40:14B-49, which states in part:
Any municipal authority for the carrying out and effectuation of its purposes, and (a) any of the local units (b) any other municipality whether within or without the district and (c) any other municipal authority, any sewerage authority or any other public body of the State empowered to treat or dispose of sewage or solid waste (all such local units, municipalities, other municipal authorities, sewerage authorities and other bodies being hereinafter referred to individually as a "governmental unit") for fostering the relief of waters in, bordering or entering the territorial area of the governmental unit from pollution or threatened pollution or assisting the municipal authority in carrying out and effectuating its purposes, may enter into a contract or contracts providing for or relating to the collection, treatment and disposal of sewage or solid waste originating in the district or received by the municipal authority, or originating in the territorial area of or collected by the governmental unit, by means of the sewerage or solid waste system or any sewerage or solid waste facilities of the governmental unit or both, and the cost and expense of such collection, treatment and disposal.
*513 The service agreement between Randolph MUA and the Rockaway Authority for treatment was consummated pursuant to the latter section and N.J.S.A. 40:14A-23. The statutes afore-discussed clearly contemplate the power of the Randolph MUA to dispose of sewerage of residents of its district either through its own facility or through contract with another facility.
The core of the present controversy is the right of the Randolph MUA to collect "sewer service charges" pursuant to N.J.S.A. 40:14B-22 from the class plaintiffs. This section of the statute, insofar as here relevant, states:
Every municipal authority is hereby authorized to charge and collect rents, rates, fees or other charges (in this act sometimes referred to as "sewer service charges") for direct or indirect connection with, or the use or services of, the sewerage system. Such sewer service charges may be charged to and collected from any person contracting for such connection or use or services or from the owner or occupant, or both of them, of any real property which directly or indirectly is or has been connected with the sewerage system or from or on which originates or has originated sewage or other wastes which will directly or indirectly have entered or may enter the sewerage system, and the owner of any such real property shall be liable for and shall pay such sewerage service charges to the municipal authority at the time when and place where such sewerage service charges are due and payable. [Emphasis supplied]
The class plaintiffs argue that since their sewerage never passed through any physical equipment or pipes owned by the Randolph MUA they cannot be liable under the statute for any "sewer service charges." They contend that their liability is limited to the actual disbursements to Dover ($10) and the Rockaway Authority (about $45), and no more.
We disagree with plaintiffs' contention. The statute, as required by N.J.S.A. 40:14B-68, must be read liberally to advance its expressed legislative purpose. N.J.S.A. 40:14B-22, which confers the power to charge fees, is broadly cast. It speaks of "direct or indirect connection with, or the use of services of, the sewerage system" and "of any real *514 property which directly or indirectly is or has been connected with the sewerage system," and further, of any real property "from or on which originates or has originated sewerage or other wastes which directly or indirectly have entered" the system. Id. We conclude that this broadly cast power to charge rates was most likely conferred on municipal sewerage authorities by the Legislature to permit them to deal flexibly and sensibly with the many complex service and billing situations which can arise. There is obviously no necessary relationship between political boundaries and sewer systems, as this case amply demonstrates. This section was designed to permit a municipal authority to charge a customer where the full service is rendered, but in an indirect fashion, as in the present case.
We conclude that since the Randolph MUA is providing and paying for the treatment of the plaintiffs' sewerage, pursuant to a service contract authorized by the statute, the plaintiffs are thereby at least indirectly connected to the Randolph MUA sewerage system, so as to permit it to levy charges against them under N.J.S.A. 40:14B-22. Randolph MUA may legally supply the treatment and disposal aspect of the sewerage service through its own facility or through outside contract. It makes no difference to its customers which way this is done; they are still customers of the system.
Our view is fortified by the fact that the Randolph MUA has assumed the duty of payment to Dover for the costs of the transmission of the sewerage and the maintenance of the collecting system. The Randolph MUA thereby becomes permanently obligated to Dover for any charges or expenses for annual service or capital improvements which arise out of the services Dover furnishes to plaintiffs, just as if the Randolph MUA itself owned the sewer lines. This obligation, which the Randolph MUA has readily acknowledged, is a necessary corollary of its undertaking to furnish full sewerage service to the class plaintiffs. Should Dover's service charge increase, or should it become necessary for Dover to *515 commit capital to upgrade its lines, the Randolph MUA and not the individual plaintiffs will bear the direct obligation to Dover.
The Randolph MUA had two theoretical choices in billing the four categories of single-family residential users described supra. It could have attempted to calculate an actual cost, including costs for administration, treatment of its own pipes for infiltration, and capital reserves, for each category, and devised four separate billings. The charges for the same service would have varied, but only because of geographical location within the community, which location determined the course (and cost) a particular residential user's sewerage took to a treatment plant. Instead, the Randolph MUA chose to charge all connectees in the township in the single-family residential class the same charge, $125. This uniform charge was entirely consistent with the following language in N.J.S.A. 40:14B-22, which states:
Such rents, rates, fees and charges, being in the nature of use or service charges, shall as nearly as the municipal authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system, and may be based or computed either on the consumption of water on or in connection with the the real property, making due allowance for commercial use of water, or on the number and kind of water outlets on or in connection with the real property, or on the number and kind of plumbing or sewerage fixtures or facilities on or in connection with the real property, or on the number of persons residing or working on or otherwise connected or identified with the real property, or on the capacity of the improvements on or connected with the real property, or on any other factors determining the type, class and amount of use or service of the sewerage system, or on any combination of any such factors, and may give weight to the characteristics of the sewage and other wastes and other special matter affecting the cost of treatment and disposal of the same, including chlorine demand, biochemical oxygen demand, concentration of solids and chemical composition, and, as to service outside the district, the cost of installation of necessary physical properties. [Emphasis supplied]
This decision to treat all single-family dwelling units in Randolph Township uniformly is not only consistent with *516 N.J.S.A. 40:14B-22 but also with prior judicial consideration of similar legislation on uniform rates for sewer services. The actual cost to furnish service to home A may differ from the cost to service home B, but the statute focuses on the nature of the service, not on unit cost-accounting methods. Our Supreme Court has stated, as to connection or tapping fees, chargeable under the Sewerage Authority Law:
The statute need not be read to require precise mathematical equality, but rather to contemplate rough equality, keeping in mind that we are in an area in which, as with respect to other tax impositions, absolute equality is neither feasible nor constitutionally vital. [Airwick Industries, Inc. v. Carlstadt Sewerage Authority, 57 N.J. 107, 122 (1970), app. dism. 402 U.S. 967, 91 S.Ct. 1666, 29 L.Ed.2d 132 (1971)]
Plaintiffs here in effect insist on a precise mathematical relationship between the actual cost of their service and the amount they should be required to pay (putting aside their apparent contention that they should not be required to make any payment for the administrative expense, the cost to correct infiltration, and the accumulation of capital, of the Randolph MUA). The township, in contrast, has followed the statute and achieved, not mathematical precision, but rather statutory uniformity by charging all similarly situated users the same fee. See also, S.S. & O. Corp. v. Bernards Tp. Sewerage Auth., 62 N.J. 369 (1973), where the Supreme Court stated as to connection fees:
The statutory scheme of equality and uniformity contemplates not only that developers be treated alike but that all homes connected with the sewerage system, whether or not they are part of a development project, should be dealt with in a nondiscriminatory manner. [at 385]
This court considered language in the Sewer Authorities Law, N.J.S.A. 40:14A-8(b), similar in all relevant respects to N.J.S.A. 40:14B-22, in dealing with the question of whether residential users could be charged different *517 rates for sewer service based on whether their respective sections had previously been sewered or unsewered. This court there stated:
We are in agreement with the holding of the Chancery Division that rate classification according to the user's location in the community, although perhaps equitable in view of previous contributions to the system and of the benefits actually received from its extension, was beyond the statutory power of the authority to prescribe. [Landy v. Bellmawr Sewerage Auth., 61 N.J. Super. 396, 399 (App. Div. 1960), aff'g Kline v. Bellmawr Sewerage Auth., 55 N.J. Super. 153 (Ch. Div. 1959)]
The determination of rates is to be made with relation to the factors expressly stated in the statute, all of which pertain to the amount or characteristics of the sewage treated and disposed of in the system. [Id. 61 N.J. Super. at 399-400]
We concluded in Landy that "the unmistakable direction here is to classify according to the use to be made of the system" and "[t]here is no room for discrimination on the basis of what sections of the community will benefit from the installation of necessary physical properties." Id. at 400. This court there found no intent "to infuse the concept of special assessments into this legislation." Ibid. See generally, Annotation, "Municipalities-Sewer Use Rates" 61 A.L.R.3d 1236, 1243 (1975).
Notwithstanding the complexities of this sewerage system, Randolph Township charges all single-family residences the same fee for the same service. This approach squares with the statutory requirement of uniform treatment for the same "type, class and amount of use or service." The expense of service is spread nondiscriminatorily among all similar users in the district served.[2]
For the reasons stated the judgment of the trial court is affirmed.
NOTES
[1] The record before the trial court was supplemented by letter briefs filed by the parties post-argument. These letter briefs enabled this court to better understand the intricate factual framework. There was no dispute as to the facts set forth therein.
[2] No contention has been advanced in this litigation that the $125 service fee per single-family residential unit is in itself an unreasonable or unfair charge for the service.